AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
THE PROPERTIES DESCRIBED IN THE AFFIDAVIT AND THE ATTACHMENTS.

Case No. MR 25-776

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ____________ District of New Mexico, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841 | Distribution and possession with intent to distribute controlled substances |

The application is based on these facts:
See attached Affidavit.
This Search warrant was approved by AUSA Elaine Ramirez

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA David Zimmerman
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Electronically signed and telephonically sworn *(specify reliable electronic means)*.

Date: April 25, 2025

*Judge's signature*

City and state: Albuquerque, NM

Karen B. Molzen, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>8221 Otero Ave. NE, Albuquerque, NM 87109 – **ANESI PREMISES 1**<br><br>112 Sandia Rd. NW, Albuquerque, NM 87107 – **MONTOYA PREMISES 1**<br><br>204 San Clemente Dr. NW #3, Albuquerque, NM 87110 - **MONTOYA PREMISES 2**<br><br>901 Tramway Blvd. NE #R-119, Albuquerque, NM 87123 – **GARCIA PREMISES 1** | Case No. ____________________ |

**AMENDED AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, David Zimmerman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 8221 Otero Ave. NE, Albuquerque, NM 87109 (hereinafter referred to as **"ANESI PREMISES 1"**), 112 Sandia Rd. NW, Albuquerque, NM 87107 ("**MONTOYA PREMISES 1**"), 204 San Clemente Dr. NW #3, Albuquerque, NM 87110 ("**MONTOYA PREMISES 2**"), and 901 Tramway Blvd. NE #R-119, Albuquerque, NM 87123 ("**GARCIA PREMISES 1**"), the **SUBJECT PREMISES**, further described in Attachment A, for the things described in Attachment B.

2. I have been a Special Agent with the Drug Enforcement Administration ("DEA") since May of 2020. I attended the DEA Training Academy in Quantico, Virginia, where I received approximately 14 weeks of specialized narcotics-related training. As part of the curriculum at the

DEA academy, I received advanced training in controlled substance identification, narcotics related investigation techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance, and electronic monitoring techniques. I have received training in the methods of operation of Drug Trafficking Organizations, and in the investigation of Title 21 violations. Prior to becoming a Special Agent, I was a sworn Law Enforcement Officer in the state of Colorado. Starting in December 2013, I served with the Boulder Police Department and the Aurora Police Department. I was tasked with conducting investigations of violations of the Colorado Revised Statutes and have authored arrest warrants and search warrants for residences, cell telephones, and social media platforms related to drug investigations. As a result, I am familiar with matters including, but not limited to, the means and methods used by individuals to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions.

3. I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl and cocaine, by David ANESI, Vincent MONTOYA Francisco GARCIA, Bruce SEDILLO, and others. Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the DEA, and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of ANESI, MONTOYA, GARCIA, SEDILLO, and others (the "SUBJECTS")[1].

4. I make this affidavit based upon my own personal knowledge, which is

---

[1] Agents learned of ANESI and MONTOYA through drug traffickers, Alexandro IBARRA and Anthony ORTIZ-MARTINEZ, following a series of T-III's. IBARRA and ORTIZ have since been arrested. The investigation has continued since the arrests of IBARRA and ORTIZ.

substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

a. Information provided by Task Force Officers ("TFOs"), Special Agents ("SAs"), and Intelligence Research Specialists of the Drug Enforcement Administration, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b. Results of physical surveillance conducted by agents during the investigation;

c. A review of telephone toll records and subscriber information;

d. Information derived from consensually recorded conversations;

e. Information derived from lawfully intercepted telephone conversations and text messages;

f. A review of driver's license and automobile registration records;

g. Records from commercial databases; and

h. Records from the National Crime Information Center ("NCIC").

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6. I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of, *inter alia*:

   a. 21 U.S.C. § 841(a)(1) – Distribution of and possession with intent to distribute controlled substances; and

   b. 21 U.S.C. § 846 – Conspiracy.

## EVIDENCE SOUGHT DURING SEARCH

7. Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

8. Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings,

storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

9. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

10. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

11. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings,

information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

17. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

18. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers,

or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

19. Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21. Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

22. Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio

that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

23. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

24. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes

personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

25. A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

26. As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the SUBJECT PREMISES, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27. *Necessity of seizing or copying entire electronic media.* In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the

electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints

that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will

unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## PROBABLE CAUSE

### Background

29. During the course of the investigation, DEA Agents identified, David ANESI,

Vincent MONTOYA, Francisco GARCIA, and Bruce SEDILLO as high volume drug traffickers in the Albuquerque, New Mexico metro area, specifically distributing fentanyl, methamphetamine, and cocaine.

**ANESI PREMISES 1**

30. In the months of February and March of 2024, during a parallel investigation into the Alexandro IBARRA DTO, agents became aware of David ANESI and the ANESI PREMISES 1. Agents learned that ANESI was acquiring large amounts of fentanyl from the IBARRA DTO and was capable of selling suspected quantities of one hundred thousand fentanyl pills in a short period of time, as well as kilogram quantities of cocaine. Through multiple surveillances in this time period, agents learned that ANESI would secret both money and narcotics at ANESI PREMISES 1. Agents frequently observed ANESI and other customers come and go from ANESI PREMISES 1 before and after narcotics deals.

31. On August 9, 2024, the Honorable Kea Riggs, United States District Judge for the District of New Mexico, issued an order authorizing the interception of wire and electronic communications to and from ANESI TELEPHONE 2. Interceptions began on August 9, 2024 through September 7, 2024. Agents learned of ANESI's source of supply (SOS), who was identified as Heriberto SALAZAR AMAYA (hereinafter referred to as HSA) and agents began investigating the HSA DTO.

32. On August 9, 2024, agents intercepted a call with ANESI and HSA and ordered "350" of suspected fentanyl as well as 50 pounds of suspected methamphetamine for the following day.

33. On August 10, 2024, agents established surveillance on ANESI. Agents located

ANESI at Barber Ville West, located at 6200 Coors Blvd. NW, Albuquerque, NM 87120. ANESI was driving a white GMC pickup truck. Agents conducted surveillance on ANESI, who returned to ANESI PREMISES 1. Prior to ANESI arriving, agents observed a black Mercedes sedan parked at ANESI's residence.

34. Once ANESI arrived at ANESI PREMISES 1, agents observed the unidentified male from the Mercedes retrieve a black bag from the trunk of the vehicle and then go into the garage. Due to the vantage point of the residence, agents were unable to get a clear view into the garage without being detected. Agents observed ANESI retrieve a red bag from the GMC truck and went into the garage.

35. A short time later agents observed a grey Dodge Challenger, bearing New Mexico license plate BNAS49, arrive at ANESI PREMISES 1 and back into the driveway. The driver was later identified from a New Mexico driver's license as JM[2]. JM retrieved a black backpack from the trunk and entered the garage.

36. At approximately 6:38 pm, agents observed a grey Ford Fusion bearing New Mexico license plate 373XFH arrive at ANESI PREMISES 1 and park on the street. The vehicle showed the registration to SZG at 6901 Glenrio Rd NW, Albuquerque, NM. Agents were aware of SZG from another parallel DEA case, where SZG is the registered owner of a different vehicle that transported narcotics to a controlled purchase.

37. Agents observed a Hispanic male, who was later identified through motor vehicle department records as the registered owner, SZG, get out of the Ford Fusion. SZG carried a

---

[2] Any individual who has not yet been charged is referred to by their initials.

backpack and entered the garage of ANESI PREMISES 1.

38. A few minutes later, agents observed JR exit the garage with a backpack, and observed JR place the backpack in the trunk, before departing ANESI PREMISES 1. Agents then observed the driver of the Ford Fusion come out of the garage and return to the Ford Fusion with a backpack. The driver placed the backpack in front passenger seat and departed ANESI PREMISES 1. Agents maintained surveillance on the Ford Fusion. The Ford Fusion arrived at 8705 Sugarite Trail NE, Albuquerque, NM 87113. Surveillance was then terminated.

39. Based on the surveillance, this is consistent with drug trafficking. Agents believe that ANESI and his customers provided bulk cash to the courier in exchange for the drugs based on the interceptions mentioned above. Agents know this to be common for drug traffickers to utilize cash in exchange for drugs instead of electronic currency when dealing in person. Agents on surveillance of this transaction observed multiple bags go in and out of different individuals' vehicles which is consistent in bulk money exchange for large amounts of narcotics. Agents believe ANESI has previously utilized ANESI PREMISES 1 as a stash location for narcotics and is continuing to do so.

40. On August 14, 2024, agents intercepted an outgoing telephone call from ANESI PHONE 2 to HSA. During the intercepted call, ANESI informed HSA that ANESI wanted a "T-shirt" that day. Agents believe "T-shirt" references a kilogram of cocaine. HSA agreed and informed ANESI that the HSA would be ready.

41. On the same date, Agents conducted surveillance on ANESI as he left ANESI PREMISES 1 and conducted various errands. Agents maintained surveillance on ANESI PREMISES 1 and observed a silver Chevy Cruze, bearing New Mexico license plate RWW824

arrive at ANESI PREMISES. A Hispanic male exited the Cruze with a large black backpack and was observed standing on the porch as he presumably waited for ANESI to return to ANESI PREMISES 1. Eventually, the Hispanic male returned to the Cruze and waited in the Cruze.

42. A short time later, ANESI arrived at ANESI PREMISES 1 and the Hispanic male got out of the Cruze with a backpack, which appeared to be full and heavy, and entered the garage. Approximately fifteen minutes later, the Hispanic male came out of the garage with the backpack, which was visibly less heavy and not as full. The Hispanic male entered the Cruze and departed ANESI PREMISES 1.

43. Agents observed the Cruze travel to multiple apartment complexes. Agents observed two additional males with backpacks get into the Cruze at one of the apartments and then travel to an Air BnB. Agents are aware that the HSA DTO utilizes AirBnBs where the couriers stay at and store narcotics at.

44. Agents continued to observe ANESI meet with various couriers in this DTO and observed most of ANESI and couriers meeting at ANESI PREMISES 1.

45. On November 5, 2024, agents observed the silver Chevy Cruze arrive at Extra Space Storage, located at 4909 Juan Tabo Blvd. NE, Albuquerque, NM. Agents know this to be a storage facility that is used in the HSA DTO and believed to be a possible stash location. Agents have observed couriers come and go from this storage facility[3] before and after suspected drug transactions.

---

[3] The HSA DTO has utilized more than one storage unit at this facility.

46. Agents observed an unidentified Hispanic male come out of the storage facility and load at least three suitcases into the trunk of the vehicle. Surveillance was maintained on the Cruze.

47. A short time later, the Cruze arrived at ANESI PREMISES 1. Agents observed ANESI arrive shortly after in a white Toyota Tacoma, which agents know to be one of ANESI's vehicles. The driver of the Cruze got out of the Cruze and walked inside of the garage of ANESI PREMISES 1. Agents then observed the driver come out of the garage and walk to the Cruze. Agents observed the driver retrieve two large suitcases from the trunk of the vehicle and walk them into the garage. The suitcases were clearly heavy and the driver had to roll them. After the driver placed the suitcases in the garage, agents observed ANESI and the driver come out of the garage and return to the Cruze. Agents then observed the driver pull two more large suitcase out of the backseat of the Cruze and the driver rolled both suitcases into the garage with ANESI following.

48. Agents then observed ANESI and the driver emerge from the garage with no suitcases or bags. ANESI got into the Tacoma and left ANESI PREMISES 1. The driver of the Cruze returned to the Cruze and sat there for a few minutes. An unknown vehicle then dropped off a second male, with a large backpack, and the second male got into the Cruze and it left the area.

49. Based on my training and experience, the surveillance, and information agents know about how ANESI operates as well as the couriers, agents believe that the driver of the Cruze was delivering narcotics to ANESI at. ANESI PREMISES 1.

50. Agents continued to conduct frequent spot checks surveillance on ANESI and observed frequent traffic with people showing up to ANESI PREMISES 1. ANESI would open the garage, and the customer would go into the garage. A short time later, the customer would come

out of the garage and leave. This activity is consistent with drug activity and consistent with the patterns agents have seen at ANESI PREMISES 1.

51. On March 11, 2025, District of New Mexico United States Federal District Judge David Herrera Urias authorized a court order (MR-25-404) for the interception of wire and electronic communications for target telephones: (505) 524-4990 (HSA PHONE 11) and (720) 415-7496 (HSA PHONE 12).

52. On March 23, 2025, at approximately 7:23 p.m., agents received an outgoing phone call (Session 2181) from (505) 948-0721, a phone number used by ANESI, and (505) 524-4990 (HSA PHONE 11), used by HSA. The phone call follows as:

| SPEAKER | TRANSCRIPTION / TRANSLATION |
|---|---|
| | [Beginning of call] |
| ANESI | [Background: music] Hello? |
| HSA | Hey. What's up, bro? |
| ANESI | What up? Hey, um… I'll be ready for another twenty (20) and then, um… uh, one (1) of the t-shirts that I got like about al—more, little more than half down. Is that cool? |
| HSA | All right. That's fine. |
| ANESI | Yeah. I got like, I got what I owe you, and then I got half down for the t-shirt. |
| HSA | Okay. |
| | [Voices overlap] |
| ANESI | And then, I need another twenty (20), too. |
| HSA | All right. Do it right now? Or… |
| | [Voices overlap] |
| ANESI | Give it two (2) months. |
| HSA | Yeah. |
| ANESI | Um, well like… yeah you—yeah. That'd be cool. |
| HSA | Well, I can meet you in like an hour. That's fine? |
| ANESI | Yeah. |
| HSA | All right. I'll see you there in like an hour. |
| ANESI | All right, bro. Later. |
| HSA | All right. |
| | [End of call] |

53. Agents believe that ANESI is asking HSA for the quantity of "20", which is possibly fentanyl, and 1 kilogram of cocaine, "T shirt". ANESI and HSA talk prices and agree to meet in an hour.

54. Agents conducted surveillance at ANESI PREMISES 1 and observed ANESI's white Toyota Tacoma at the residence on the driveway.

55. Agents observed a silver Ford F-150, bearing New Mexico license plate CAWY09, arrive at ANESI PREMISES 1 and park on the driveway. Agents are aware that this Ford F-150 is associated with the HSA DTO and one of the vehicles that the couriers utilize. Agents observed ANESI open the garage and come to the front of the truck. The courier, who was identified as Cesar ACUNA MORENO (hereinafter referred to as ACUNA) from previous surveillances, got out of the truck with a large backpack. ACUNA and ANESI went into the garage and closed the garage.

56. A short time later, ACUNA came out of the garage with the backpack and got into the driver seat of the Ford F-150. Agents intercepted ANESI calling HSA inquiring if HSA wanted to sell the truck ACUNA was in, further confirming that HSA sent his courier to ANESI.

57. Agents believe that during this surveillance, ACUNA dropped off narcotics to ANESI PREMISES 1 on behalf of HSA.

58. Due to the totality of the circumstances, surveillances, intelligence on ANESI and ANESI's premises, agents believe that ANESI has utilized and continues to utilize ANESI PREMISES 1 as a stash location and that ANESI is trafficking narcotics to and from ANESI

PREMISES. Agents know that ANESI PREMISES 1 has cameras around the residence and have seen in the garage from the public street, that ANESI has a large camera system in his garage.

59. Agents also believe that ANESI conducts much of his drug trafficking activity at ANESI PREMISES 1, late at night or early in the morning, and that such activity often includes moving drugs into or out of ANESI PREMISES 1. Pursuant to 21 U.S.C. § 879, I submit there is probable cause to believe that grounds exist for the warrant to be served at any time of the day or night

**MONTOYA PREMISES 1, MONTOYA PREMISES 2, and MONTOYA PREMISES 3**

60. Agents were made aware of Vincent MONTOYA from their investigation of ANESI through phone toll analysis as a frequent contact of ANESI. Agents observed ANESI meet with MONTOYA's truck after ANESI picked up a large amount of narcotics in February of 2024. However, due to the time of the night agents were not able to positively identify MONTOYA at that time.

61. On August 17, 2024, agents intercepted communications between ANESI and MONTOYA. ANESI informed MONTOYA that ANESI had narcotics and MONTOYA confirmed with ANESI that they were good ones. They agreed to meet later on that day.

62. On the same date, agents intercepted additional calls with ANESI and MONTOYA. During an intercepted call, MONTOYA confirmed that ANESI had "20." ANESI confirmed the quantity. MONTOYA told ANESI that MONTOYA still had "180-200" because his customers did not want them. Based on the information agents have learned through the investigation, agents later learned that when MONTOYA and ANESI discuss these amounts that

they are possibly talking about fentanyl in large quantities. Agents believe that MONTOYA told ANESI had 180,000 -200,000 suspected fentanyl pills. MONTOYA told ANESI that MONTOYA had sold over 130,000-150,000. ANESI told MONTOYA that they will talk to HSA together and agree to meet at ANESI PREMISES 1. At that point in the investigation, agents were still learning how MONTOYA, ANESI, and HSA communicated and learning their verbiage, codes, and amounts they were discussing.

63. On an additional call, ANESI asked if MONTOYA had left his house yet. MONTOYA told ANESI he had not left yet, and ANESI asked MONTOYA for 2 "waters.", Agents believe the term "water" to be street slang for methamphetamine. Agents know it is common for drug traffickers to traffic multiple narcotics and often times help each other supplying other drugs.

64. Agents established surveillance at ANESI PREMISES 1 and observed a red Hyundai sedan BXJP11 arrive at ANESI PREMISES 1 and back in. The vehicles registers to Vincent MONTOYA, at 712 Douglas MacArthur Rd. NW, Albuquerque, New Mexico 87107, to a red 2021 red Hyundai.

65. Agent intercepted a call with MONTOYA and ANESI talking to HSA through ANESI's telephone. During the call MONTOYA and HSA discuss various amounts of narcotics, quality, switching out narcotics that MONTOYA already had, and future arrangements. During the intercepted call, HSA informed MONTOYA that HSA was going to soon be selling his normal narcotics, which HSA referred to as the "GSV". At that time agents were unaware of what narcotic was labeled "GSV" but suspected it may be fentanyl based on the context of the call. HSA told MONTOYA that HSA would contact his courier and send a courier to ANESI

PREMISES 1 to deliver to MONTOYA. MONTOYA then left ANESI PREMISES 1.

66. Later that evening, agents intercepted a call from HSA to ANESI, where HSA advised he was on the way. Agents observed MONTOYA arrive in the red Hyundai to ANESI PREMISES 1. A white Chevrolet Colorado, driven by George NAVARETTE, who agents know to be a courier for HSA, arrived at ANESI PREMISES 1, as well. MONTOYA and NAVARETTE walked into the garage of ANESI PREMISES 1 with a large black backpack.

67. A short time later, agents observed MONTOYA go to the trunk of the Hyundai and retrieve a bag out of the trunk before going back into the garage. NAVARETTE then left the garage with the large backpack and left in the Colorado.

68. Agents observed ANESI and MONTOYA put a large box in the back of MONTOYA's Hyundai before MONTOYA left.

69. Agents believe that based on the intercepted call and surveillance that HSA sent NAVARETTE to deliver and trade out narcotics with MONTOYA.

70. On August 30, 2024, District of New Mexico United States Federal District Judge David Herrera Urias authorized a court order (MR-24-1602) for the interception of wire and electronic communications for target telephone: (505) 906-0877 (SOS TELEPHONE 1)[4].

71. On September 2, 2024, agents intercepted HSA talking directly to MONTOYA. During the intercepted all, MONTOYA asked HSA for "350"[5], which agents believe is possibly

---

[4] Telephone number 505-906-0877 was originally documented as SOS TELEPHONE 1 until the SOS was identified as Heriberto SALAZAR AMAYA (HSA)

[5] During the intercepted calls, agents believe MONTOYA and HSA refer to boxes as an increment for 10,000 pills.

350,000 fentanyl pills. They agree to meet on the same date. HSA told MONTOYA that they would meet in the same area as ANESI PREMISES 1 and that HSA would send MONTOYA an address. MONTOYA informed HSA that he had all the cash ready to go. HSA then advised that HSA was going to give MONTOYA 200,000 pills on that date and then 150,000 on the following day.

72. Agents then intercepted a SMS text message from HSA to MONTOYA, with the address, "7504 Burke St NE, Albuquerque, NM 87109". HSA also asked MONTOYA if he had suitcases or boxes from previous deals MONTOYA could bring. HSA then informs MONTOYA on a call that he was sending 250,000 and that he would give him the other 100,000 the following day. MONTOYA advised HSA that he had duffle bags and that he will bring two.

73. Agents established surveillance at the address HSA sent MONTOYA, which is Loma Del Norte Park. Agents observed MONTOYA arrive in the red Hyundai. A short time later agents observed the same Chevrolet Colorado arrive and park by MONTOYA's vehicle.

74. Agents observed NAVARETTE get out of the Colorado and approach MONTOYA, who exited the Hyundai. Agents observed MONTOYA walk to the rear driver's side door of the Colorado, open the door, and retrieve a large black tote with a yellow lid, then carry the tote to the trunk of MONTOYA's Hyundai. Agents stated that MONTOYA appeared to struggle lifting and carrying the tote from one vehicle to the next. Shortly after, agents observed MONTOYA enter the driver's seat of the Hyundai and NAVARRETE enter the driver's seat of the Colorado, both vehicles departing from the park.

75. Surveillance was maintained on MONTOYA and agents observed MONTOYA drive to 112 Sandia Rd. NW, Albuquerque, NM (hereinafter referred to as MONTOYA

PREMISES 1. Due to the street being one way in and one way out, agents did not initially observe which unit number MONTOYA went into, but it was since been confirmed that MONTOYA is frequently and consistently into unit #A.

76. Agents subpoenaed PNM utilities for 112 Sandia Rd NW, Albuquerque, NM, and received results that stated Unit #A was rented to Roberta HERRERA since March of 2021. Agents know HERRERA to be the significant other of MONTOYA. HERRERA is also listed as paying utilities at 712 Douglas MacArthur Rd. NW, Albuquerque, NM (hereinafter referred to as MONTOYA PREMISES 3).

77. Through open source databases, agents learned that MONTOYA was also associated with 204 San Clemente Ave. NW Apt 3, Albuquerque, NM (hereinafter referred to as MONTOYA PREMISES 2). Agents authored a ping warrant for MONTOYA's telephone number 505-403-1226 (MONTOYA TELEPHONE 1).

78. On September 6, 2024, agents began intercepting GPS ping locations on MONTOYA. Agents observed that ping radius was often large but in the area of MONTOYA PREMISES 1, MONTOYA PREMISES 2, and MONTOYA PREMISES 3. Agents conducted spot checks on all three locations on a frequent bases and observed MONTOYA's red Hyundai at all three premises. It appeared from the routine spot checks that MONTOYA would be at MONTOYA PREMISES 2 in the morning and late evening, which is consistent with MONTOYA utilizing MONTOYA PREMISES 2 as a primary residence. Agents believe that based on the surveillance mentioned above, and the following surveillances, that MONTOYA utilizes MONTOYA PREMISES 1 as a stash location. Agents believe from following information that associates of MONTOYA primarily reside at MONTOYA PREMISES 3, or it's used to stash

money.

79. On September 5, 2024, agents authored a tracking warrant for MONTOYA's red Hyundai (Reference 24-MR-1634), which was signed by the Honorable Judge Steven C. Yarbrough. Agents attempted to install the tracking warrant in the authorized time period but agents learned that MONTOYA would park at MONTOYA PREMISES 2 through the night, which has a camera directly in front of the parking spot and the front door of MONTOYA PREMISES 2. Due to the sensitivity of the installation of tracking devices and the possibility of compromising the case, agents were unable to install the tracker at MONTOYA PREMISES 2. When agents conducted surveillance on MONTOYA PREMISES 1 to install the tracker, agents learned MONTOYA was only at this location for short periods of time, which was not enough to get the tracker installed. Due to this information learned from this, agents believe MONTOYA utilizes both locations regularly. Agents also learned that MONTOYA has a white Dodge Ram with New Mexico Disabled Veteran license plate DV323S. Agents have observed MONTOYA in the Dodge Ram on multiple occasions and as recent as April 16, 2025 at MONTOYA PREMISES 1.

80. On October 31, 2024, District of New Mexico United States Federal District Judge James O. Browning authorized a court order (MR-24-2014) for the interception of wire and electronic communications for MONTOYA TELEPHONE 1. On November 1, 2024, Agents began interception on MONTOYA TELEPHONE 1.

81. Throughout the interception period agents intercepted frequent calls where suspected customers contacted MONTOYA for narcotics. Agents learned that MONTOYA would operate late in the evenings and into the night.

82. On November 10, 2024, agents intercepted a call from a customer, Angel MAESTAS, asking MONTOYA for narcotics. The transcript follows as:

| SPEAKER | TRANSCRIPTION / TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| MAESTAS | What's going on, man? |
| | [Voices overlap] |
| MONTOYA | *Hello*? |
| MAESTAS | [Clears throat] |
| MONTOYA | Nothing much, you? |
| MAESTAS | Chilling, chilling. Just fucking getting back here in and get to– fucking been hauling cows, staying busy. All my cows came off the mountains so, that's a good thing though. [Laughs] |
| MONTOYA | Fuck yeah. |
| | [Voices overlap] |
| MAESTAS | Fuck. Hell yeah. Then the P.O. said I could go out there. So, I've been fucking, tearing it up. [Laughs] |
| MONTOYA | Heck yeah! |
| | [Voices overlap] |
| MAESTAS | No. Yeah, hell yeah. No, I was seeing if you're gonna be out and about tonight. |
| MONTOYA | Yeah. |
| MAESTAS | Yeah, okay cool. Could I get uh, five (5) of those uh, one (1) water and one (1) of the other on, the other ones I get. |
| MONTOYA | Alright. |
| MAESTAS | Yeah, hell yeah. |

| | |
|---|---|
| MONTOYA | You still out of town or what? |
| MAESTAS | Uh, I'll be probably back in like mm, thirty (30), forty five (45) minutes. Yeah. |
| MONTOYA | Alright, cool. |
| MAESTAS | Yeah, so I'll let you know when I hit the house. I'll just text you to say I'm here, or whatever. You know what I mean? |
| MONTOYA | Yeah. Alright, bro. |
| MAESTAS | Right on, bro. Thank you. Later. |
| MONTOYA | Later. [Pause] [Aside: There it is.] |

**[End of call]**

83. Agents believe MAESTAS is asking MONTOYA for possibly 5,000 fentanyl pills, one pound of methamphetamine, and another unknown narcotic.

84. Agents established surveillance at on MONTOYA at MONTOYA PREMISES 2, where agents observed MONTOYA's red Hyundai parked in front of the residence. A short time later, agents observed MONTOYA come out of MONTOYA PREMISES 2, wearing all red, and got into the driver seat of the Hyundai with children, before leaving.

85. Agents observed MONTOYA make a short stop at a hotel before going to a restaurant. Agents then intercepted a call where MONTOYA and MAESTES would meet shortly.

86. Agents reestablished surveillance on MONTOYA at 4th and Griegos, Albuquerque, NM, where agents observed MONTOYA meet with an older Ford Taurus in the parking lot[6]. A short time later MONTOYA returned to MONTOYA PREMISES 2 and agents observed

[6] Based on intercepted calls, MONTOYA and his girlfriend, Roberta HERRERA, were meeting with someone regarding stolen property.

HERRERA and the kids go inside. MONTOYA then departed in the Hyundai.

87. Surveillance was maintained and agents observed MONTOYA depart from MONTOYA PREMISES 2, and go to MONTOYA PREMISES 1. MONTOYA was at MONTOYA PREMISES 1 for approximately 10 minutes before departing in the Hyundai again.

88. Surveillance was maintained and agents observed MONTOYA go to 9610 N Guadalupe Trl. NW, Albuquerque, NM 87114. This address is associated with MAESTAS and believed to be MAESTAS primary residence. Due to the time of night and location of this residence, agents were unable to see an exchange without compromising the investigation and being detected. Agents intercepted a call where MONTOYA advised MAESTAS that he was there.

89. Agents believe that MONTOYA utilized both residences on this occasion to further his drug trafficking activity. Agents believe that when MONTOYA left MONTOYA PREMISES 2 originally that he did a suspected drug transaction at the hotel, and then utilized MONTOYA PREMISES 1 prior to completing a suspected drug transaction with MAESTAS.

90. Agents maintained routine surveillance on MONTOYA through the investigation and continued to intercept MONTOYA receiving narcotics from HSA and HSA's couriers. Agents routinely check MONTOYA PREMISES 1 and MONTOYA PREMISES 2 and see MONTOYA and his vehicles at these locations.

91. On March 11, 2025, District of New Mexico United States Federal District Judge David Herrera Urias authorized a court order (MR-25-404) for the interception of wire and electronic communications for target telephones: (505) 524-4990 (HSA PHONE 11) and (720) 415-7496 (HSA PHONE 12).

92. On March 25, 2025, agents intercepted calls between MONTOYA and HSA. During the intercepted calls, MONTOYA and HSA were arranging for a meet to take place that evening. MONTOYA told HSA that MONTOYA had stashed away approximately $200,000 and that MONTOYA needed to restock. HSA asked MONTOYA what quantity of narcotics he wanted. MONTOYA indicated he wanted 6, which is possibly 600,000 fentanyl pills, but MONTOYA told him "3", which agents believe is possibly 300,000 fentanyl pills. MONTOYA asked if those are "Leons" and HSA said yes and stated that the "Leons" and "GSV" are the best. Agents believe that HSA labels his narcotics with names, such as "Leon".

93. Agents established surveillance on MONTOYA at MONTOYA PREMISES 1. Agents observe MONTOYA arrive at MONTOYA PREMISES 1 in the white Dodge Ram and park behind the Red Hyundai.

94. While MONTOYA was at MONTOYA PREMISES 1, agents then intercepted a call where MONTOYA and HSA agreed to meet on the following day. MONTOYA advised that MONTOYA still needed to collect money to complete this transaction. Agents believe that it is common for drug traffickers to have to collect money from narcotics that the trafficker is owed prior to getting resupplied.

95. Following the call where MONTOYA told HSA that MONTOYA needed to collect money, agents observed MONTOYA leave MONTOYA PREMISES 1 and go directly to 712 Douglas MacArthur Rd NW, Albuquerque, NM (hereinafter referred to as MONTOYA PREMISES 3). Agents learned that the residences listed to living at MONTOYA PREMISES 3, are relatives of MONTOYA, such as his brother, father, and mother. Agents observed multiple individuals from MONTOYA PREMISES 3, come from the residence and meet with

MONTOYA at the truck. Based on the intercepted calls, this was consistent with MONTOYA collecting money. MONTOYA was at MONTOYA PREMISES 3 for a short period of time and then left and returned to MONTOYA PREMISES 1.

96. On March 26, 2025, agents intercepted calls with MONTOYA and HSA, where they agreed to meet at 7:15 pm. Agents established surveillance at MONTOYA PREMISES 1 and MONTOYA PREMISES 2, and MONTOYA PREMISES 3.

97. At approximately 7:06 pm, HSA contacted MONTOYA and informed MONTOYA that HSA courier, who was later identified as Cesar ACUNA MORENO, would be there shortly. MONTOYA asked if it was going to be in the same spot, the "ditch". Agents know from this investigation that when MONTOYA is referencing the "ditch" he is referring to a neighborhood area that is close by MONTOYA PREMISES 3. Agents have conducted surveillance and observed MONTOYA meet with HSA's couriers at this location previously. MONTOYA would frequently send customers to meet with them as well.

98. Agents observed MONTOYA and HERRERA exit MONTOYA PREMISES 1. HERRERA was dragging a grey suitcase/duffle bag that was equipped with wheels out of MONTOYA PREMISES 1. The bag was clearly heavy as HERRERA had trouble dragging the bag. Agents observed HERRERA attempt to put the suitcase in the rear passenger side door but instead took it to the driver side, where MONTOYA assisted putting it in the backseat. MONTOYA got into the driver seat, HERRERA in the front passenger seat, and they left.

99. Surveillance was maintained on MONTOYA and subsequently surveillance was established on ACUNA, driving the Honda CRV. Agents observed MONTOYA and ACUNA arrive at the intersection of La Cienega and Griegos, in Albuquerque, NM.

100. Agents observed MONTOYA exit the Dodge Ram and ACUNA exit the Honda CRV. Agents observed MONTOYA provide ACUNA with the grey suitcase and exchange it for a large black tub with a yellow lid. Agents could observe that the tub was heavy and MONTOYA struggled carrying it. MONTOYA placed the tub in the Dodge Ram and left. ACUNA MORENO put the suitcase in the Honda CRV and left. Surveillance was maintained and followed MONTOYA back to MONTOYA PREMISES 1. Agents observed MONTOYA and HERRERA carry the black and yellow tub in tandem, into MONTOYA PREMISES 1.

101. Agents believe that MONTOYA and ACUNA MORENO exchanged narcotics and money on behalf of HSA and that following the exchange MONTOYA took the narcotics back to MONTOYA PREMISES 1, which is the suspected stash location.

102. Agents believe that MONTOYA utilizes MONTOYA PREMISES 1, MONTOYA PREMISES 2, and MONTOYA PREMISES 3, for different parts of his drug trafficking organization. MONTOYA is a documented gang member and a criminal history which includes arrest for drug trafficking/distribution with an unknown disposition, assault with a deadly weapon arrest, and violent person crimes which led to felony convictions.

103. Agents also believe that MONTOYA, conducts much of the drug trafficking activity at the MONTOYA PREMISES 1, MONTOYA PREMISES 2, and MONTOYA PREMISES 3, late at night or early in the morning, and that such activity often includes moving drugs into or out of PREMISES. Pursuant to 21 U.S.C. § 879, I submit there is probable cause to believe that grounds exist for the warrant to be served at any time of the day or night.

**GARCIA PREMISES 1**

104. Agents have been aware of and investigating Francisco GARCIA, who is a known

drug trafficker in Albuquerque, New Mexico. Agents know GARCIA to be a high volume customer of HSA and believe that GARCIA orders a large amount of suspected fentanyl and methamphetamine from HSA.

105. Through the investigation, agents have learned that GARCIA lives at 901 Tramway Blvd. NE #R-119, Albuquerque, NM 87123, in building Q (GARCIA PREMISES 1).

106. On March 13, 2025, agents intercepted a phone call with GARCIA and HSA, where GARCIA asked HSA for "10" and HSA told GARCIA it would be approximately forty minutes. Agents believe that GARCIA is possibly asking HSA for 10,000 fentanyl pills.

107. Agents established surveillance on GARCIA's residence. Agents observed multiple vehicles that were associated with GARCIA, parked in different parking spots than before.

108. Agents observed a Gold Volkswagen, which is a known courier vehicle in the HSA DTO, arrive at GARCIA's apartment complex. Agents then intercepted a telephone call where HSA asked GARCIA what apartment number. GARCIA advised that it was "R-119" (hereinafter referred to as GARCIA PREMISES 1). GARCIA told HSA that GARCIA was on the balcony. Agents observed GARCIA outside of R-119, which indicates GARCIA recently moved units. HSA advised that the courier was in a gold Volkswagen. Agents observed the courier, who was identified as David LOPEZ, get out of the gold Volkswagen with a backpack and go into GARCIA PREMISES 1 with GARCIA.

109. A short time later, LOPEZ left GARCIA PREMISES 1 and returned to the Volkswagen before leaving.

110. Agents believe based on the intercepted call and surveillance, that LOPEZ

delivered suspected fentanyl pills to GARCIA at GARCIA PREMISES 1.

111. On March 21, 2025, agents intercepted calls with HSA and GARCIA, during the intercepted call, GARCIA told HSA that GARCIA was ready for "another 10" and HSA agreed. GARCIA and HSA discussed prices that other drug traffickers were selling fentanyl pills for and their limits on prices. HSA told GARCIA that HSA would see him soon, agents believe that HSA is referring to the couriers seeing GARCIA soon as HSA does not normally show up on these transactions. GARCIA also informed HSA that GARCIA was waiting on a third party in order to get "180" which agents believe GARCIA is possibly referring to 180,000 fentanyl pills.

112. Agents established surveillance at GARCIA PREMISES 1 and observed GARCIA's vehicles in the parking lot.

113. A short time later a white Volkswagen Passat, was observed parked in front of GARCIA PREMISES 1. Agents know this Passat to be involved in the HSA DTO and that is a frequent car that the courier utilize to deliver narcotics on behalf of HSA. Due to the position of the vehicle agents did not initially see anyone go into GARCIA PREMISES 1.

114. Agents then observed ACUNA come out of GARCIA PREMISES 1 with a large black backpack on. ACUNA then got into the Passat and left.

115. Agents believe that ACUNA delivered suspected narcotics to GARCIA. Later on the same date, Agents intercepted a call with GARCIA and HSA where GARCIA informed HSA that GARCIA wanted the ones with the "bottom 30", which agents believe is referring to the fentanyl pills that are stamped with a 30 and a line on them.

116. On March 6, 2025, agents utilized an undercover agent (UC) to order 3000 fentanyl pills from a customer who is supplied by GARCIA, Nicholas TANNER, for $4,500. On

the same date, the UC drove TANNER to GARCIA PREMISES 1 and parked in the parking lot. The UC observed TANNER go into GARCIA PREMISES 1, while the UC was in the vehicle. The UC observed a Honda CRV, which agents know to be utilized by ACUNA, arrive at GARCIA PREMISES 1, and go inside GARCIA PREMISES 1 with a large backpack.

117. A short time, later the UC observed ACUNA leave GARCIA PREMISES 1 and subsequently leave the apartment complex. TANNER came out of GARCIA PREMISES 1 and provided the UC with blue pills, consistent with fentanyl and approximately 3000 pills. The pills tested presumptive positive as fentanyl.

118. April 10, 2025, agents utilized the UC, to order fentanyl pills and methamphetamine from GARCIA, through TANNER.

119. At approximately 12:00 pm, agents intercepted a call from GARCIA to HSA, where GARCIA informed HSA that GARCIA was ready for more. Agents believe that this conversation was GARCIA ordering narcotics from HSA, and presumably for the UC.

120. Agents established surveillance at GARCIA PREMISES 1. At approximately 1:00 pm, agents observed ACUNA arrive at GARCIA PREMISES 1 in the Honda CRV. Agents observed ACUNA get out of the Honda with a backpack and go into GARCIA PREMISES 1.

121. Approximately eight minutes later, agents observed ACUNA come out of GARCIA PREMISES 1, and leave in the Honda.

122. On the same date, around 6:00 pm, the UC arrived in the apartment complex of GARCIA PREMISES 1. TANNER arrived in the same parking lot and advised the UC to park at the DK gas station, located close by and in sight of GARCIA's residence.

123. The UC observed TANNER, walk from the DK gas station, to GARCIA

PREMISES 1. A short time later, TANNER came out of GARCIA PREMISES 1 and provided the UC with approximately 4000 fentanyl pills. The pills were later counted to 4060 and tested presumptive positive as fentanyl.

124. Agents believe that GARCIA is responsible for distributing a large amount of narcotics and that GARCIA is utilizing GARCIA PREMISES 1 as a stash location. Agents have seen GARCIA receive numerous deliveries to GARCIA PREMISES 1 as well as the previous apartment GARCIA was in.

## ADDITIONAL INFORMATION

125. In November of 2024, agents were investigating Bruce SEDILLO, who was a high volume drug trafficker in Albuquerque, New Mexico. Agents were aware that SEDILLO was trafficking fentanyl and that SEDILLO was a frequent and high volume customer of HSA.

126. On November 11, 2024, agents conducted surveillance on SEDILLO, at SEDILLO's residence, located at 8006 Morrow Ave SE, Albuquerque, NM, and observed an HSA courier deliver to SEDILLO, following SEDILLO ordering suspected narcotics.

127. On November 12, 2024, at approximately 4:54 pm, agents intercepted an incoming telephone call from HSA on HSA TELEPHONE 8 to SEDILLO. A partial transcript follows as:

| **SPEAKER** | **TRANSCRIPTION / TRANSLATION**<br>**[Beginning of call]** |
|---|---|
| SEDILLO | What's up, boss? |
| SALAZAR AMAYA | Hey bro, hey bro, so which, which uh, which label do you give to your people?<br>[Voice overlaps] |
| SEDILLO | I've already tapped in to Leon and GSV. |
| SALAZAR AMAYA | And, both are the same?<br>[Voices overlap] |
| SEDILLO | Yeah boss, they are not the same and then I have some. I had five (5) of the other ones, 5 boats left of the, off the last ones. |

128. Agents believe that SEDILLO is referring to the LEON and GSV as labels that were provided to SEDILLO on the narcotics SEDILLO received. Agents believe the term "boats" is street slang for 1000 fentanyl pills per each boat.

129. On November 13, 2024, agents executed a search warrant at SEDILLO's residence and secondary location. Agents seized approximately 145,000 fentanyl pills from 8006 Morrow Ave. A large portion of the fentanyl pills were located in a suitcase in the trunk of SEDILLO's vehicle in the garage. The fentanyl pills were in clear plastic bags with labels, "Leon" and "GSV".

130. SEDILLO was subsequently arrested on the same date.

**CONCLUSION**

131. I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A, and seize the items described in Attachment B.

132. AUSA Elaine Y. Ramírez reviewed and approved this application.

Respectfully submitted,

David Zimmerman
Special Agent
Drug Enforcement Administration

Electronically signed and telephonically sworn
On April 25, 2025:

Karen B Molzen

THE HONORABLE KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**ANESI PREMISES 1**

*Property to be searched*

The property to be searched is 8221 Otero Ave. NE, Albuquerque, NM 87109 (hereinafter referred to as **"ANESI PREMISES 1"**).





further described as a white/brown house with a flat roof with the number 8221 marked on the curb.

The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located on the PREMISES in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicles may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A-2**

**MONTOYA PREMISES 1**

*Property to be searched*

The property to be searched is 112 Sandia Rd. NW #A, Albuquerque, NM 87107 (hereinafter referred to as **"MONTOYA PREMISES 1"**),




further described as a multi-unit single story apartment complex. **MONTOYA PREMISES 1** is a white building with the numbers "112" affixed on the north side of the building in black and the letter "A" affixed on the building to the left of the front door.

The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located on the PREMISES in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in front of,

the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicles may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT A-3

## MONTOYA PREMISES 2

*Property to be searched*

The property to be searched is 204 San Clemente Dr. NW #3, Albuquerque, NM 87110 (hereinafter referred to as **"MONTOYA PREMISES 2"**).





further described as a multi-unit two story complex. **MONTOYA PREMISES 2** is a tan building with red/orange pitched roof. MONTOYA PREMISES 2 has the numbers "204" in black numbers on the north side of the building and the number"3" located to the right of the front door.

The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located on the PREMISES in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicles may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A-4**

**GARCIA PREMISES 1**

*Property to be searched*

The property to be searched is 901 Tramway Blvd. NE #R-119, Albuquerque, NM 87123(hereinafter referred to as **"GARCIA PREMISES 1"**),



further described as a multi-unit apartment complex. **GARCIA PREMISES 1** is located on the second floor of building R with a white door with white numbers "119" posted on the door. Building R is clearly marked on the south side of the building.

The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located on the PREMISES in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicles may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

# ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841 and 846, those violations involving Anthony the SUBJECTS, and others still unknown, including:

1. Controlled substances, including but not limited to, fentanyl, methamphetamine, heroin, cocaine, and marijuana.
2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.
3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.
4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.
5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.
6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.
16. Digital video surveillance systems, including the associated storage media.
17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any

individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the PREMISES, to the fingerprint scanner of the device; (2) hold a device found at the PREMISES in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.